UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:

TASSO LASKARATOS,                                                    Chapter 13

                                                                     Case No. 19-41363-ess

                                        Debtor.
-----------------------------------------------------------------x




**MEMORANDUM DECISION AFTER EVIDENTIARY HEARING ON
STAY VIOLATION CLAIM**




Appearances:

Tasso Laskaratos                          Irena Milos, Esq.
575 80th Street (Apartment 3A)            Irena Milos Law Office
Brooklyn, NY 11209                        210 Canal Street (Suite 502)
    *Debtor, Pro Se*                      New York, NY 10013
                                              *Attorneys for Yu Tang*
                                              *Realty LLC*


August 30, 2019

**HONORABLE ELIZABETH S. STONG**
**UNITED STATES BANKRUPTCY JUDGE**

## Introduction

Tasso Laskaratos commenced this bankruptcy case on March 7, 2019 by filing a *pro se* petition for relief under Chapter 13 of the Bankruptcy Code. Some six weeks later, on April 14, 2019, representatives of Mr. Laskaratos' landlord, Yu Tang Realty LLC ("Yu Tang"), came to his home at 575 80th Street in Brooklyn (the "80th Street Property") and attempted to clear out several items from the backyard of the building. These items included a table and chairs, a barbecue, several large potted plants and a watering can, and a large piece of plywood that shielded the backyard from the street, among other items. A confrontation ensued, the police were summoned, and Yu Tang abandoned its efforts and left.

On the following day, April 15, 2019, Mr. Laskaratos, again *pro se*, filed an application for an order to show cause, seeking a determination that Yu Tang's actions violated the automatic stay that came into effect upon the filing of his bankruptcy case. He seeks a broad range of relief, including compensatory and punitive damages, and an order directing Yu Tang to "cease and desist all harassing" of him and his family. OSC App. at 1, ECF No. 24.

It is plain from the record of this case, from the records of the bankruptcy cases of Mr. Laskaratos' mother Irini and his brother Kosta, and from the long history of litigation in New York state court between Yu Tang and the Laskaratos family, that the relationship between the Laskaratos family and Yu Tang has been difficult, strained, and contentious. That relationship appears to have begun some three years ago, in July 2016, when Yu Tang purchased the 80th Street Property from Irini Laskaratos. In connection with that purchase, Yu Tang permitted Ms. Laskaratos to continue to live in the building for a year, and in return, Ms. Laskaratos agreed to pay monthly rent of $1,958 to Yu Tang.

But on this application, the Court's task is far narrower and more specific than the range of disputes among these parties. In order to decide Mr. Laskaratos' stay violation claim, the Court must determine neither more nor less than whether each of the elements of a stay violation has been established. That is, the Court must decide first whether Mr. Laskaratos has established that he filed an individual bankruptcy petition, whether he has shown that Yu Tang had notice of his bankruptcy petition, whether Yu Tang's actions amounted to a willful violation of the automatic stay, and whether he has suffered damages. *In re Leiba*, 529 B.R. 501, 506 (Bankr. E.D.N.Y. 2015).

### Jurisdiction and Authority To Enter a Final Judgment

Mr. Laskaratos' stay violation claim arises under Bankruptcy Code Sections 362(a) and 362(k). "Core proceedings include, but are not limited to . . . matters concerning the administration of the estate." 28 U.S.C. § 157(b)(2)(A) and (G). Courts in this Circuit have found claims of violations of the automatic stay to be "core matter[s], going to fundamental, and critically important, bankruptcy policy." *In re Ames Dep't Stores, Inc.*, 542 B.R. 121, 141 & n.79 (Bankr. S.D.N.Y. 2015) (citing *Eastern Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs Inc.)*, 124 B.R. 635, 638 (Bankr. S.D.N.Y. 1991)). Accordingly, Mr. Laskaratos' stay violation claim is a core matter. *See* 28 U.S.C. § 157(b)(2)(A). And as a core matter, this Court has constitutional authority to enter a final judgment, because Mr. Laskaratos' claim stems "from the bankruptcy itself." *Stern v. Marshall*, 564 U.S. 462, 499 (2011). For these reasons, this Court has jurisdiction to consider and enter judgment on these claims under 28 U.S.C. § 1334(b) and the Standing Order of Reference dated August 28, 1986, as amended by Order dated December 5, 2012, of the United States District Court for the Eastern District of New York. This decision

constitutes the Court's findings of fact and conclusions of law to the extent required by Bankruptcy Rule 7052.

**Procedural History**

The path to these proceedings has been long.  It began with a real estate transaction in 2016, when Yu Tang acquired the 80th Street Property from Irini Laskaratos, and includes proceedings in New York State Court and Ms. Laskaratos's own Chapter 13 bankruptcy case, as well as that of Kosta Laskaratos.  Those events and proceedings provide some context for the present matter, and they are described in pertinent part below.

*Yu Tang's Acquisition of the 80th Street Property*

On or about July 15, 2016, Yu Tang purchased the 80th Street Property from Irini Laskaratos.  The parties' Contract of Sale provides for Yu Tang to pay $1,845,000 to acquire the property, and for Irini Laskaratos to remain at the property for a period of one year after the sale. It also provides that her right to remain is conditioned on $40,000 being held in escrow in Yu Tang's attorney's "IOLA account," to "be returned to [her] at the time that she surrenders possession," and on her payment of monthly rent of $1,958 to Yu Tang.  Contract of Sale, ECF No. 17-7 ¶ 19 (Yu Tang Stay Relief Motion).

*The New York City Housing Court Action*

On May 23, 2017, almost one year after the sale of the 80th Street Property and before Mr. Laskaratos filed this bankruptcy case, Yu Tang brought an action to evict Ms. Laskaratos and "undertenants" John Doe and Jane Doe in New York City Housing Court (the "Eviction Action").  The grounds for the eviction proceeding were Ms. Laskaratos' failure to make the monthly rent payments, as agreed when Yu Tang purchased the 80th Street Property.

In the Eviction Action, Yu Tang sought a final judgment awarding it (i) possession of the premises, together with a warrant of eviction; (ii) rental arrears in the amount of $15,880, with interest accruing from September 15, 2016, along with fair value of use and occupancy of the premises; and (iii) attorneys' fees, costs, and disbursements in an amount to be determined, as well as such other and further relief as the court deemed just and proper.

On June 25, 2018, the Housing Court recorded and approved a settlement reached between Yu Tang and Irini Laskaratos in the Eviction Action.  In the stipulation, the parties agreed as follows:

(i)     the parties consented to the jurisdiction of the New York state court;

(ii)    Yu Tang was awarded a money judgment in the amount of $43,076 (the "Judgment"), along with a judgment of possession and a warrant of eviction, to be stayed through October 15, 2018;

(iii)   the Judgment represented rent for the period from September 15, 2016 through June 16, 2018, in the amount of $1,958 per month;

(iv)    the Respondents were required to keep current with rental payments, and all amounts received would first be applied towards current rental payments, and then to the Judgment;

(v)     the Respondents were required to remove their personal items from the basement of the 80th Street Property by October 15, 2018;

(vi)    if Respondents did not comply with the Stipulation terms, then a warrant to execute the warrant of eviction would be issued upon notice by the Marshal;

> (vii)    if the Respondents paid the Judgment and kept current with ongoing rental
>
> payments as they became due, then the Judgment would be satisfied and the
>
> warrant of eviction would be vacated; and
>
> (viii)    the Respondents' answer to Yu Tang's petition was marked withdrawn.

*See* Stipulation (Yu Tang Stay Relief Motion), ECF No. 17-9.  The stipulation was signed by

representatives of Yu Tang and by Ms. Laskaratos through a Greek interpreter, and entered as an

order by the Housing Court.

About two months later, on August 20, 2018, the Housing Court approved a second

stipulation entered into between Yu Tang and Ms. Laskaratos, in resolution of the issues raised

by Ms. Laskaratos in an application for an order to show cause.  That stipulation states that Ms.

Laskaratos "has brought to court" rent payments for July 2018 and August 2018, and directs Ms.

Laskaratos to mail her future rent payments directly to Yu Tang or its counsel.  Stipulation on

OSC (Yu Tang Stay Relief Motion), ECF No. 17-9.

But this second stipulation did not resolve the parties' disputes.  By decision and order

dated October 18, 2018, the Housing Court denied Ms. Laskaratos' application for an order to

show cause.  The court observed that Ms. Laskaratos sold the 80th Street Property to Yu Tang

and remained at the property as a tenant with monthly rent of $1,958.  It found that she was

"advised to bring 1,958 twice, . . . and does not have said monies."  Decision and Order dated

October 18, 2018 (Yu Tang Stay Relief Motion), ECF No. 17-10.  The court also found that Ms.

Laskaratos did not make the $43,076 payment required to satisfy Yu Tang's judgment.

### *Irini Laskaratos' Bankruptcy Case*

On November 26, 2018, Ms. Laskaratos filed a *pro se* petition for relief under Chapter 13

of the Bankruptcy Code.  Voluntary Petition, Case No. 18-46717, ECF No. 1.  Three days later,

on November 29, 2019, Yu Tang moved for relief from the automatic stay. In that motion, Yu Tang requested stay relief under Bankruptcy Code Sections 362(d)(1) and 362(d)(2), to permit it to continue the Eviction Action.

This Court held a hearing on Yu Tang's motion on January 10, 2019, at which Ms. Laskaratos, again *pro se*, and Yu Tang appeared and were heard. And on February 4, 2019, the Court issued an order modifying the automatic stay, to permit Yu Tang to pursue its rights under applicable law with respect to the 80th Street Property, and staying the effective date of that relief for three weeks, until February 25, 2019.

On March 1, 2019, four days after the Court's stay relief order became effective, Ms. Laskaratos filed a *pro se* motion to reconsider the order. On March 7, 2019, the Court held a hearing on the motion to reconsider, at which Ms. Laskaratos, again *pro se*, accompanied by her son Mr. Laskaratos, and Yu Tang appeared and were heard. On March 7, 2019, the Court issued an order granting in part the motion to reconsider, delaying the effective date of the modification of the automatic stay to April 1, 2019, and directing Ms. Laskaratos to pay adequate protection to Yu Tang in the amount of $1,958, for that period of time, and denying all of the other requested relief.

On December 28, 2018, the Clerk of the Court issued a Final Notice of Section 521 Deficiencies, noting several missing schedules and statements. And on April 10, 2019, the Court issued an order to show cause why this case should not be dismissed in light of these deficiencies. From time to time, and on August 14, 2019, the Court held hearings on the order to show cause, at which Ms. Laskaratos did not appear. Ms. Laskaratos did not file the missing documents, and at the August 14 hearing, the Court closed the record and reserved decision.

*This Bankruptcy Case*

On March 7, 2019 – the date of the Order on Ms. Laskaratos' motion for reconsideration – Mr. Laskaratos commenced this bankruptcy case by filing his own petition for relief under Chapter 13 of the Bankruptcy Code.  Voluntary Petition, Case No. 19-41363, ECF No. 1.  In his Chapter 13 petition, Mr. Laskaratos states that he rents his residence, and that his landlord has obtained a judgment of eviction against him.  He also checked the box that directs him to fill out the "Initial Statement About an Eviction Judgment Against You (Form 101A)" and to file it as a part of his bankruptcy petition.  Voluntary Petition at 3, ECF No. 1.

On March 13, 2019, the Clerk's Office issued a notice of non-compliance with Bankruptcy Code Section 362(*l*)(1), stating that Mr. Laskaratos failed to deposit with the Clerk of the Court any rent that would become due with respect to his residence in the thirty-day period following the petition date.

On March 28, 2018, Mr. Laskaratos filed an initial statement indicating the existence of a judgment of eviction against him, that he had the right to remain in his residence by paying the entire delinquent amount, and that he provided the Clerk of the Court with a deposit for one month's rent that would be due in the thirty days following his bankruptcy petition.  That same day, he also filed a notice of compliance and intent to cure the default.  And on April 12, 2019, Mr. Laskaratos forwarded the rent deposit in the amount of $1,958 to Yu Tang, and filed a FedEx receipt indicating that the deposit was delivered.

The record shows that Mr. Laskaratos has not complied with several of the requirements of his Chapter 13 bankruptcy case.  He has not filed all of the necessary schedules and statements.  On April 8, 2019, the Clerk of the Court issued a Final Notice of Section 521 Deficiencies, noting these missing schedules and statements.  Some three weeks later, on April

29, 2019, the Court issued an order to show cause why this case should not be dismissed in light of these deficiencies.  From time to time, and on August 14, 2019, the Court held hearings on the order to show cause, at which Mr. Laskaratos appeared and was heard.  But he did not file the missing documents, and at the August 14 hearing, the Court closed the record and reserved decision.

Mr. Laskaratos also has not paid the full filing fee associated with filing this case, and a $200 balance remains outstanding.  On July 10, 2019, the Clerk of the Court issued a motion to dismiss this case on grounds that the filing fee remains unpaid.  The Court held hearings on that motion on August 6, 2019 and August 14, 2019.  But he did not pay the balance of the filing fee, and here too, at the August 14 hearing, the Court closed the record and reserved decision.

*Yu Tang's Motion for Relief from the Automatic Stay*

On April 1, 2019, some three weeks after Mr. Laskaratos filed this bankruptcy case, Yu Tang moved for relief from the automatic stay under Bankruptcy Code Sections 362(d)(1) and 362(d)(2), again seeking to continue the Eviction Action in Housing Court.

On May 8, 2019, the Court held a hearing on Yu Tang's stay relief motion, at which Yu Tang and Mr. Laskaratos appeared and were heard.  At that hearing, the Court determined that cause existed to grant stay relief.[1]  And on May 20, 2019, the Court issued an order granting stay relief to Yu Tang, permitting it to pursue its rights under applicable law with respect to the 80th Street Property.

---

[1] Of course, and as other courts have observed, "the fact that cause existed to lift the stay is not relevant to a determination as to whether the stay has been violated."  *In re Salov*, 510 B.R. 720, 732 (Bankr. S.D.N.Y. 2014).

*This OSC Application*

On April 15, 2019, Mr. Laskaratos filed this Application for an Order to Show Cause. On that same day, the Court issued an order scheduling a hearing on the application.

One week later, on April 22, 2019, Mr. Laskaratos filed an Affidavit in Support of his OSC Application.  In his affidavit, Mr. Laskaratos advances additional arguments that he suffered damages as a result of Yu Tang's actions.  He also identifies several legal authorities that may apply in some landlord-tenant disputes, but do not appear to bear directly on his stay violation claim.

On April 23, 2019, the Court held an initial hearing on the OSC Application, at which Mr. Laskaratos and Yu Tang appeared and were heard.  Following that hearing, on April 26, 2019, the Court issued an order granting in part the OSC Application by confirming that the automatic stay was in effect and directing Yu Tang to comply with the automatic stay; and separately, directing Mr. Laskaratos to comply with the reasonable safety instructions of Yu Tang with respect to the property.  The Court also scheduled an evidentiary hearing on Mr. Laskaratos' stay violation claim for May 8, 2019, and directed the parties to identify their witnesses and exhibits for the hearing and to be prepared to present their evidence, including the testimony of witnesses and exhibits, at the hearing.

On April 30, 2019, and May 6, 2019, Mr. Laskaratos filed a list of Exhibits A, B, and C, describing video evidence and a notice that he intended to offer at the May 8 evidentiary hearing. And on May 6, 2019, Yu Tang likewise filed an exhibit list, identifying fifteen pictures and three additional exhibits to be offered as evidence.

And on May 8, 2019, the Court held an evidentiary hearing on the OSC Application, at which Mr. Laskaratos, again *pro se*, and Yu Tang appeared and were heard.  Upon the

completion of the witnesses' testimony and receipt of exhibits, the Court closed the record – with the exception of permitting the parties to file, on consent, a copy of the Contract of Sale for the 80th Street Property – and reserved decision.  Mr. Laskaratos filed the Contract of Sale on May 10, 2019.

*Mr. Laskaratos' Arguments in Support of His Requests for Relief*

In the OSC Application, Mr. Laskaratos seeks "to notify the Court" of the events of April 14, 2019 at the 80th Street Property and requests the entry of an order directing Yu Tang to "cease and desist all harassing."  OSC App. at 1.  He recounts that on that day, representatives of Yu Tang arrived at the building, "in person with a graffiti van," and "attempted [to] steal[] . . . all properties in backyard, without a marshal, but just himself and daughter and a worker, and sons."  *Id.*  And he states that "police had to be called," and the officers "stopped the illegal activity" and instructed Yu Tang to "place everything back."  *Id.*  Mr. Laskaratos also notes that he made a payment of one month's rent, in the amount of "$1,958.00 to the landlord of which the landlord was fully notified."  *Id.*

Mr. Laskaratos also states that while these events were taking place, Yu Tang's "super kept calling me a 'rat,' a scumbag, a jerk-off."  *Id.*  And he states that "the super and his wife continuously advo[c]ate this behavior while together 'in-sync' with [Yu Tang].  All in attempt to scare [and] manipulate . . . not only myself but my mother and brother as well."  *Id.*

In addition, Mr. Laskaratos advances several legal arguments that do not directly concern his stay violation claim.  He argues that New York tenants with rent-stabilized leases are protected from non-payment actions of a landlord as a basis for eviction.  He also points to several New York State statutes, including the following:

- *New York Debtor and Creditor Law Section 282(2)*.  Mr. Laskaratos argues that the New York State legislature "enacted [this statute] with the background understanding that State Law independently protects rent-stabilized leases from creditors/landlords, making it unnecessary for the State Legislature to expressly mention such rent-stabilized leases in the [Debtor and Creditor Law]'s bankruptcy exemptions."  Aff. in Supp. at 2, ECF No. 28.

- *New York Real Property Actions and Procedures Law Section 223-b*.  Mr. Laskaratos states that tenants may be entitled to damages where landlords harass or retaliate against tenants who complain to government entities in good faith, participate in tenant organizations, or otherwise take good faith actions to protect their rights.  He argues that the "agent 'super' and family retaliated [against the Laskaratos family] in innumerous fashions guided by the Creditor/Yu Tang Realty."  *Id.*  And he states that the superintendent and his family "[i]n absolute fact of proof . . . would never have had occupancy" at the 80th Street Property if the Laskaratos family had not sold the property to Yu Tang, and suggests that he and his family are not "deserving of such retaliation" directed by Yu Tang.  *Id.*

- *New York Real Property Law Actions and Procedures Law Section 235-e*.  Mr. Laskaratos states that landlords must provide tenants with written receipts of rent payments where those payments are made by methods other than personal check.  He argues that Yu Tang "never provided receipts for rent paid," and that such failure "barr[ed] all attempts for [the Laskaratos family] to acquire the renewal lease afforded by law," because Yu Tang opposed the Laskaratos family's filing for a renewal lease "by not

stating the months of payments made of which Creditor Yu Tang received and was well aware." Aff. in Supp. at 2-3.

- *New York Penal Law Section 241.05 and New York City Administrative Code Sections 27-004, 27-005, and 27-2115*. Mr. Laskaratos states that landlords may not conduct "any action intended to force a tenant out of an apartment or to compel a tenant to give up any rights granted by tenant by law," and such harassment may take the form of physical or verbal abuse, willful denial of services, frivolous litigation, and lying or intentionally misrepresenting the law. Aff. in Supp. at 3. Mr. Laskaratos argues that Yu Tang exhibited harassing behavior based on the "[c]onstant cursing and intimidation of [Yu Tang's employee, the super], threats, curses, locks entrances causing fire hazards, [and] restrict[ion of the] terms of lease at all times," with Yu Tang's knowledge, and at its direction. *Id.*

- *The Definition of a Class E Felony*. Mr. Laskaratos states that theft, assault, forcible touching, and aggravated harassment can constitute a Class E felony, and can be punished by incarceration. *Id.* He states that the conduct of Yu Tang's representatives fits the definition for a felony, by appearing at the 80th Street Property on April 14, 2019 to attempt to take personal property from the backyard of the premises, and by lying "to settle the matter," about a "non-existing fire department report," when in fact "it was the Landlord/Creditor Yu Tang Realty who caused the fire hazard and at the same time breaking the terms of the lease [of the Laskaratos family] of exclusive rights to the backyard" of the property. Aff. in Supp. at 4.

Mr. Laskaratos argues that he and his family suffered damages as a result of the actions of Yu Tang and those acting at its direction. He describes generally the emotional distress and

disruption that has been caused over an extended period, and describes in particular the distress that he and his family members experienced on April 14, 2019, all as a consequence of the actions of Yu Tang and its representatives.  He also argues that the following circumstances illustrate the harm that he and his family have suffered in the form of "real-life and long lasting effects" caused by Yu Tang's conduct:

- Irini Laskaratos' missed doctor's appointments "endangering her life . . . largely in part, due to the stress of these innumerous retaliations";

- an attack on Kosta Laskaratos by a friend of the building superintendent, who stated "'I'm going to knock you out and your brother, nobody on this block likes your family and get the f[*]ck off the block,'" leading to a response by the police and an arrest; and

- Mr. Laskaratos "suffered a full blown Epileptic Seizure" on July 2, 2018, for which he is now on medication, "while my family was in [Housing Court] proceedings with Creditor/Yu Tang Realty."

Aff. in Supp. at 4-5.

Finally, Mr. Laskaratos provides additional background for what he describes as "the war" by Yu Tang against his family.  Aff. in Supp. at 5.  As one illustration of this, he suggests that at the time of the sale of the 80th Street Property to Yu Tang, Yu Tang relocated the new building superintendent from a rent-regulated apartment to a "deregulated apartment," and told him that he would no longer have "all rights of the previous rent-stabilized apartment . . . as long as the now 'super'" – an apparent reference to a member of the Laskaratos family – "resides at the premises" in a rent-stabilized unit.  *Id.*  "And thus," Mr. Laskaratos states, "the war began against my family."  *Id.*

13

## **The Evidentiary Record**

On May 8, 2019, this Court held an evidentiary hearing on Mr. Laskaratos' stay violation claim. Over the course of a full day, the Court heard testimony from Mr. Laskaratos and his brother, Kosta Laskaratos, in support of his claim, and received several exhibits, including videos of the April 14 events recorded by Mr. Laskaratos on his cell phone. The Court also heard testimony offered by Yu Tang in opposition to Mr. Laskaratos' claim from Yunan Tang, the secretary of Yu Tang, and received several exhibits, including photographs taken by Yu Tang's lobby surveillance camera, photographs taken by Ms. Tang of the 80th Street Property in early May, and text messages between Ms. Tang and the building superintendent.

*Mr. Laskaratos' Case*

<u>The Testimony of Mr. Laskaratos</u>

Mr. Laskaratos testified that about a week before the April 14 events, on April 8, 2019, Yu Tang posted a notice directing tenants to remove their items from the backyard (the "April 8 Notice"). He stated that on April 8, 2019, Yu Tang posted a notice "all over the first floor," and that "this thing started everything." Trial Tr. 63:1-5. The April 8 Notice states that personal items that are not removed before April 14, 2019 will be removed by cleaners on that date. It also states that Yu Tang was "instructed to clean out everything in the backyard," "as per building department regulation." Laskaratos Exhibit 4 (April 8 Notice with handwritten notes); Yu Tang Exhibit E (April 8 Notice). That notice states:

Attention All Tenants:

Please remove all of your belongings in backyard before Sunday, April 14, 2019. As per building department regulation, we were instructed to clean out everything in the backyard. If you don't remove your items by Saturday, April 13, 2019; we will send cleaning guys to clear the backyard on April 14, 2019. Please understand we are not responsible for any damages while clearing the backyard.

14

Thank you for your cooperation.

Yu Tang Realty LLC

Mr. Laskaratos testified that in response to this notice, he "called the complaint service request number," for the Buildings Department, and the "Buildings Department told me that there was no buildings violation" noted on the property.  Trial Tr. 63:20-22.  And Mr. Laskaratos stated:

Q.:  What did you do in response to this notice when you first saw it on or about April 8th?

A.:  Took one copy.

Q.:  Did you take any steps to remove your belongings from the backyard?

A.:  Your Honor, no, because I had no idea that a Buildings Department during an automatic bankruptcy stay would give a landlord the right to take personal property or remove personal property or, as it says here, please understand we are not responsible for any damages.

Trial Tr. 63:9-18.

Mr. Laskaratos testified that on April 14, 2019, he first became aware that something was happening when he "heard a noise."  Trial Tr. 39:8.  He stated:

A.:  My brother informed me, "They're in the backyard."  I said, "Who's in the backyard?"  He said, "Everyone's in the backyard."  I said, "What's going on?" He said, "They're taking stuff."  I said "They're taking stuff?  We have a bankruptcy stay."  He said, "Yes, they're taking stuff."  So I immediately called police officers to help and assist so they wouldn't steal the property in the

backyard.  And the police arrived.  And the police mediated the situation and

asked them to place the property back into the backyard.

Trial Tr. 39:9-16.

He identified the time frame as between 10:00 AM and 12:00 noon:

Q.:  What time were the police called?

A.:  I'm not sure.  It was Sunday.  My mother had gone to church.  She had not yet

arrived.  So it had to be between the hours of 10 and 12.

Trial Tr. 69:1-4.

Mr. Laskaratos also described who was present on April 14.  He stated that Yu Tang

representatives, including the individual Yu Tang, "was there in person" at the 80th Street

Property.  Trial Tr. 66:7-8.  He stated that "[o]n that day Mr. Yu Tang was there, his three sons

were there, his daughter was there," and at least one "worker was there."  Trial Tr. 65:11-12.  He

testified that Mr. Tang "[w]asn't there to damage property but was loading property" from the

backyard "into his van."  Trial Tr. 66:10-11.  He testified that the building superintendent was

"cursing" at him while these events were taking place, and that such conduct "was just the

regular cursing me out."  Trial Tr. 53:3-6.

And Mr. Laskaratos testified that he made a video recording on his cell phone of Yu

Tang's efforts to remove items from the backyard of the 80th Street Property, and that video was

received in evidence.  He stated that the video shows "a number of items right by the Johnny

pump [that] were placed inside the van prior to me exiting and taking the video."  Trial Tr.

67:11-13.  And he acknowledged that the video does not show any personal items from the

backyard of the 80th Street Property inside the van.

16

Mr. Laskaratos testified that "[p]olice had to arrive to mediate the situation so that the property wouldn't be taken." Trial Tr. 66:11-13. When asked whether, "in a general way," there was an "effort to put things back following the arrival of the police," Mr. Laskaratos testified that such an effort was made "[o]nly after instructed by the police officers." Trial Tr. 46:2-4. When asked whether he could identify any property that was removed from the backyard and not returned, Mr. Laskaratos testified that he did not "know for certain." Trial Tr. 68:6-7. And when reminded that at an earlier hearing he had stated that no property was missing, Mr. Laskaratos testified that he had not "gone back to the backyard to take any inventory" of the items at issue. Trial Tr. 70:7-9.

Mr. Laskaratos testified as to what he and his brother did following the April 14 events:

Q.: What did you do to put things back in order?

A.: I stayed outside into nighttime with my brother and we were placing everything back in the order that was fashioned and tried to make some type of assessment. You know? What was broken or wasn't broken and what was, if anything, was taken. Then I finished that around, I don't know, like 9 o'clock.

. . . And I put everything back with the assistance of my brother.

Trial Tr. 52:5-11, 52:16-17.

Mr. Laskaratos also testified about what happened on the following day, April 15, 2019. He stated that "the fire department showed up the next day." Trial Tr. 53:10-11. And he testified:

A.: The super's wife was out there with the fire department. That's why I asked the fire department, no one's going to believe me that you came here the next day on the 15th to this building out of all the buildings. So please if you can, just give

17

me something.  They said there was no fire hazard.  The only fire hazard here is

the doorknob.

 . . .

A.: They told that to me.  The fire hazard is the doorknob.  There's no fire hazard

in the backyard.  Actually, there's no fire hazard completely for this property for

the backyard.  And I said yes, but can you give me something because I'm going

to civil court?  So they tore off a piece of paper which has a front and back.  The

back of it I didn't know what to make of it.  The front of it was the fire prevention

number and the time of arrival and the time they left.

Trial Tr. 54:8-21.

Finally, Mr. Laskaratos testified about the impact that these events had on him.  He

described being the subject of abusive language by the building superintendent and his wife,

stating "[t]hroughout this time the super was cursing at me . . . He was upstairs cursing at me and

the wife opens the window and says, 'Not for long, not for long.'"  Trial Tr. 52:11-15.  When

asked whether "anything else happen[ed] that day concerning the alleged stay violation," Mr.

Laskaratos testified that "[i]t was just the regular cursing me out, cursing me through the

window.  Actually, you know, there were some neighbors there that felt a little bad for my

family."  Trial Tr. 53:3-7.  He later described the conduct by the superintendent as "hollering and

yelling."  Trial Tr. 66:16.  He also stated that "[i]t was hurtful because I knew my mother would

be coming out to the backyard and looking at the plants that she had, you know."  Trial Tr.

52:17-19.

And he testified:

A.:  I'm still in shock.  . . .

A.:  I know.  I'm so upset, I am so upset because my mother came out into the

backyard that day and considering her condition, her medical condition, and

considering that she loved and attended these plants, and . . . I had to, after being

cursed out all day, I had to go back inside and tell my mom don't worry about it,

it's okay, it's okay, you know, it'll be all right. . . . I'm still in shock from the act

itself.

Trial Tr. 74:3, 74:6-15.

Mr. Laskaratos was a forthcoming, thoughtful, and credible witness, including on

difficult and emotion-laden matters concerning his home and his family.

<u>The Testimony of Kosta Laskaratos</u>

Kosta Laskaratos also testified to the events of April 14, 2019, and the surrounding

circumstances.

He described the steps that he took when he saw the April 8 Notice.  Kosta Laskaratos

explained that when he saw the notice, he "took a picture of the notice, [and] showed it to

counsel."  Trial Tr. 82:3-4.  He testified that he received legal advice, and followed that advice

by doing "exactly what counsel told me to do which is nothing."  Trial Tr. 84:2-10.  He testified

that his attorney "notified our opposition" to the April 8 Notice, by faxing the opposition to the

Fire Marshal.  Trial Tr. 84:22-23.  Specifically, he testified:

Q:  The fax, was it faxed out to him, to the marshal?

A.  Yes.

. . .

Q:  Mr. Laskaratos, Kosta, was a fax sent out to a marshal from the counsel that

you sought legal advice from after seeing Exhibit 4?

A.  Yes.

Trial Tr. 85:3-4, 86:24-87:2.

He identified the fax that was sent to the Fire Marshal, including a fax transmittal cover sheet, a notice of Mr. Laskaratos' bankruptcy case filing, and copies of two postal money orders and customer receipts.

Kosta Laskaratos testified that on April 14, 2019, he was in the kitchen at the 80th Street Property and, upon seeing "activity in the backyard," he "went directly outside to check what was going on."  Trial Tr. 77:5-6.  He testified that he called 911 at 11:42 a.m., and that the police arrived "approximately 15 to 17 minutes after the call was made."  Trial Tr. 77:10-19.  He also testified that his mother Irini Laskaratos was at church at the time of the activities in the backyard, and that he and Mr. Laskaratos were the "only" individuals in the apartment at the time.  Trial Tr. 77:23-25, 78:1-4.  He stated that Yu Tang representatives "were removing stuff from the backyard and placing it into the van," and confirmed that these actions were "shown in the video" that was received in evidence.  Trial Tr. 101:3-7.  And he testified that when the items were returned to the backyard, they were "thrown back in a disorderly fashion and it actually did create a hazard.  And that was done by landlord's agents under the direction of" Ms. Tang.  Trial Tr. 79:22-25.

Kosta Laskaratos' testimony was forthcoming and credible, and as with the testimony of Mr. Laskaratos, it addressed difficult and emotion-laden matters concerning his home and his family.

The Exhibits Offered by Mr. Laskaratos

Mr. Laskaratos offered six exhibits, and each was received in evidence.

Laskaratos Exhibit 1 is a two minute and fifty-three second video recorded by Mr. Laskaratos on his cell phone, showing a table and chairs, a barbecue, several large potted plants, and two watering cans, on the sidewalk in front of the 80th Street Property near a van.

Laskaratos Exhibit 2 is a one minute and 53 second video recorded by Mr. Laskaratos on his cell phone, showing police officers arriving at the 80th Street Property.  It also shows the same items, as well as gardening tools and a large piece of plywood, now placed back into the backyard in a haphazard and disorderly manner.

Laskaratos Exhibit 3 is a document with two notes in Mr. Laskaratos's handwriting.  One states "No Fire Hazard" and indicates an arrival time of "10:25" and a departure time of "11:05." Another states "April 15th, morning of super's wife walking down passing door 'saying Yeah This is scumbags' Apartment 3A.'"  A third note in different handwriting, identified by Mr. Laskaratos as the Fire Marshal's notation, states "Fire Prevention" and "718-999-2000."  Trial Tr. 58:2-3.

Laskaratos Exhibit 4 is the April 8 Notice posted by Yu Tang, with additional handwritten notes by Mr. Laskaratos.

Laskaratos Exhibit 5 is comprised of the materials sent by counsel for Kosta Laskaratos to the Fire Marshal, including a fax transmittal cover sheet, a notice of Mr. Laskaratos' bankruptcy case filing, and copies of two postal money orders and customer receipts.

And finally, Laskaratos Exhibit 6 is the Contract of Sale for the 80th Street Property to Yu Tang.  This was filed by Mr. Laskaratos, pursuant to the Court's direction, following the May 8 evidentiary hearing.  Mr. Laskaratos filed several additional documents at the same time, including a document in the form of a letter to the Court with several attachments, setting forth arguments based on terms of the Contract of Sale, notices of penalties related to the 80th Street

Property, and other items.  Based on the Court's direction at the close of the evidentiary hearing, only the Contract of Sale is received in evidence as Laskaratos Exhibit 6.

*Yu Tang's Case*

The Testimony of Yunan Tang

Yunan Tang testified that she is the "secretary" of Yu Tang, and that she is familiar with the 80th Street Property.  Trial Tr. 103:19-23.  She testified that she was at the 80th Street Property, including the entry hallway and door, the backyard, and the staircase, "two, three times a month."  Trial Tr. 134:3, 135:23, 137:21, 139:20, 142:10, 144:5.  She also testified that she personally typed the April 8 Notice directing tenants to remove their items from the backyard by April 13, 2019 and advising tenants that any remaining items would be removed on April 14, 2019.

Ms. Tang acknowledged that she was aware of the existence of the automatic stay at the time that she prepared the April 8 Notice.  Specifically, in response to Mr. Laskaratos's question, she testified:

Q:  At the time you wrote this – you said you wrote it.  Were you aware that there was an automatic bankruptcy stay?

A.  Yes.

Trial Tr. 185:21-23.  *See* Trial Tr. 166:22-24 (same).  Ms. Tang also testified that she had "little knowledge to the unlimited stay," and that she had "limit knowledge to the whole process of unlimited stay."  Trial Tr. 164:1-4.

Ms. Tang also acknowledged that the Laskaratos family had "used the [backyard] on a regular basis" since 2016.  Trial Tr. 200:19-23.  And she stated that as to the items in the

backyard, "we asked them to remove once the lease expired.  They never did – we asked them anything they never did."  Trial Tr. 200:22-24.

And Ms. Tang testified that she was aware that there was personal property in the backyard of the 80th Street Property.  But she stated that she did not know to whom the property belonged.  She stated:

> Q.:  And you were aware that there was personal property in the backyard?
>
> A.:  Yes, but we don't know who it belongs to.

Trial Tr. 185:24-186:1.  She stated that the personal property included "flowers, plants" and that "I think that belongs to your mother."  Trial Tr. 183:21, 185:23.  But she also acknowledged that she could not be sure:

> Q:  But you wouldn't be a hundred percent sure who – what belongs to who;
>
> correct?
>
> A.  No.

Trial Tr. 183:24-184:1.

Ms. Tang described the circumstances surrounding the events of April 14.  She testified that she and other "workers" from Yu Tang went to the 80th Street Property on that day.  Trial Tr. 157:3-9, 157:11.  Specifically, Ms. Tang testified:

> Q:  Where were you?
>
> A.:  I was there in the car, and then I came out to the car and then go to the
>
> backyard.

Trial Tr. 159:12-14.  As one example, she testified that plants from the backyard were removed and brought out to the "[s]idewalk," and that Yu Tang planned to "call the city to remove it."

Trial Tr. 188:16-17, 189:1-4.  And she testified that she got out of the car "because the moving

stop."  Trial Tr. 160:1.

 Ms. Tang testified that at some point after the workers entered the backyard, police

officers arrived on the scene.  And she stated that after speaking with the police officers, Yu

Tang decided to replace the items that had been removed back into the 80th Street Property

backyard:

 Q:  Did you have any conversation with the police officers?

 A.:  Yes

 Q.:  Was it your decision or the workers decision to [place] the items back into the

 backyard?

 A.:  Our decision.

Trial Tr. 174:8-12.  When asked whether the police needed to "mediate the situation on whether

the items would go back into the backyard," Ms. Tang testified that "the situation was

discussed."  Trial Tr. 180:6-9.  *See* Trial Tr. 180:11 ("A.:  It was discussed between police, you

and me.")

 Ms. Tang also described the events that prompted Yu Tang to prepare and post the April

8 Notice.  She testified to speaking "two years ago" with a representative from the Buildings

Department.  Trial Tr. 197:22.  She testified that "[t]here's no written.  Only oral because they

say they won't give me the violations.  They just ask me to clean it."  Trial Tr. 197:18-19.

 And Ms. Tang testified that more recently, at some point in 2019, "someone called again

the fire department and Building Department for complaint" about the condition of the backyard

at the premises.  Trial Tr. 197:25-198:2.  She stated that "I don't know who called but there's

complaints," and as a result of those complaints "[t]hey came out and asked us to do the same

thing." Trial Tr. 198:1-2, 6-7. And Ms. Tang testified that "someone from Department of Buildings came out on February 20, 2019, to examine the building" in response to "someone call[ing] to complaint" about the condition of the backyard. Trial Tr. 124:11-14.

Ms. Tang's testimony was generally forthcoming and credible, and was grounded in her personal knowledge about the events at issue.

<u>The Exhibits Offered by Yu Tang</u>

Yu Tang offered thirteen exhibits, including photographs, text messages, the April 8, 2019 Notice, and the transcript of the Court's initial hearing on the OSC Application, and each was received in evidence.

Yu Tang Exhibits B, C, F, G, H, I, J, and K are photographs taken from Yu Tang's surveillance cameras, as follows:

- Yu Tang Exhibit B is time-stamped March 19, 2019, and shows two individuals in the backyard of the 80th Street Property, one of whom appears to be a member of the Fire Department.

- Yu Tang Exhibit C is time-stamped February 20, 2019, and shows an individual from the Buildings Department in the elevator at the 80th Street Property.

- Yu Tang Exhibit F is time-stamped April 12, 2019, and shows Ms. Laskaratos removing the April 8, 2019 Notice in a common area of the 80th Street Property.

- Yu Tang Exhibit G is time-stamped April 8, 2019, and shows Ms. Laskaratos and another individual in the backyard of the 80th Street Property.

- Yu Tang Exhibit H is time-stamped April 12, 2019, and shows the backyard of the 80th Street Property. Among the personal items in the backyard are a table and chairs, several plants, an emergency cone, and a barbecue.

- Yu Tang Exhibit I is time-stamped April 12, 2019, and shows a staircase accessible from the backyard of the 80th Street Property.

- Yu Tang Exhibit J is time-stamped May 1, 2019, and shows Ms. Laskaratos watering plants in the backyard.

- Yu Tang Exhibit K is time-stamped April 17, 2019 – three days after the events giving rise to the OSC Application – and shows the backyard of the 80th Street Property. Among the personal items that it shows in the backyard are a table and chairs, several plants, an emergency cone, and a barbecue.

Yu Tang Exhibit A is a compilation of seven photographs of the backyard area of the 80th Street Property taken by Ms. Tang on May 7, 2019. These photographs show personal items including a table and chairs, several plants, watering cans and other gardening tools, and a barbecue.

Yu Tang Exhibit D shows a series of text messages between Ms. Tang and the building superintendent at the 80th Street Property. These messages indicate that Fire Department personnel were at the premises on or about March 19, 2019, and that someone "want[ed] the yard cleaned out and the wood removed from the gate" on or about March 2, 2019. A text message sent on March 2, 2019 states that "NYC was here again about the yard, door, and no heat in apartment 3A." The text messages also state in part that "[t]hese people are causing a lot of problems."

Yu Tang Exhibit E is the April 8 Notice prepared by Ms. Tang and posted by Yu Tang at the 80th Street Property, advising residents that "As per building department regulation, we were instructed to clean out everything in the backyard," and stating, that, accordingly, "[i]f you don't

remove your items by Saturday, April 13, 2019; we will send cleaning guys to clear the backyard on April 14, 2019."

And finally, Yu Tang Exhibit M is the transcript of the April 23, 2019 hearing before this Court on the OSC Application.

## The Applicable Law

### The Elements of a Stay Violation Claim

Bankruptcy Code Section 362(a) provides that "a [bankruptcy] petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of . . . any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). This stay comes into effect without any order from the bankruptcy court, and it is one of the most basic protections for debtors – and creditors – in the bankruptcy process.

In light of its "fundamental importance to a debtor's bankruptcy case, the automatic stay 'is broadly written and broadly construed.'" *In re Grinspan*, 597 B.R. 725, 733 (Bankr. E.D.N.Y. 2019) (quoting *In re NextWave Pers. Commc'ns, Inc.*, 244 B.R. 253, 271 (Bankr. S.D.N.Y. 2000)). As one court observed, "nothing is more basic to bankruptcy law than the automatic stay, and nothing is more important to fair case administration than enforcing the stay violation." *In re Lehman Bros. Holdings*, 433 B.R. 101, 112 (Bankr. S.D.N.Y. 2010), *aff'd*, 445 B.R. 130 (S.D.N.Y. 2011).

For all of these reasons, a violation of the automatic stay is a serious matter, and if established, may lead to serious consequences. Bankruptcy Code Section 362(k) provides that "an individual injured by any willful violation of the stay . . . shall recover actual damages, including costs and attorneys' fees, and in appropriate circumstances, may recover punitive

damages." 11 U.S.C. § 362(k)(1).

Courts in this Circuit recognize that a party seeking damages for a violation of the automatic stay must prove the following elements: "(1) that a bankruptcy petition was filed, (2) that the debtor is an individual, (3) that the creditor received notice of the petition, (4) that the creditor's actions were in willful violation of the stay, and (5) that the debtor suffered damages." *In re Leiba*, 529 B.R. at 506. *See Garland v. Lawton (In re Garland)*, 2001 WL 34798966 (Bankr. D. Vt. Aug. 31, 2001) (same). And the moving party "must prove each of these elements by a preponderance of the evidence." *In re Wright*, 328 B.R. 660, 663 (Bankr. E.D.N.Y. 2005) (citation and quotation omitted).

Courts also recognize that the term "'willful' in the context of § 362(k) means 'any deliberate act taken by a creditor in violation of the automatic stay, which the violator knows to be in existence.'" *In re Leiba*, 529 B.R. at 507 (quoting *Crysen/Montenay Energy Co. v. Esselen Assoc., Inc. (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098, 1105 (2d Cir. 1990)). That is, a "'specific intent to violate the stay is not required; instead, general intent in taking actions which have the effect of violating the automatic stay is sufficient to warrant damages.'" *In re Grinspan*, 597 B.R. at 744 (quoting *In re Jean-Francois*, 532 B.R. 449, 454 (Bankr. E.D.N.Y. 2015)).

And finally, in order to recover damages under Section 362(k), "the Debtor must demonstrate that he incurred damages." *In re Leiba*, 529 B.R. at 507. An award of damages may be compensatory and, in the appropriate circumstance, punitive. As one bankruptcy court has observed, "[w]here a violation of the stay is willful, § 362(k) mandates an award of actual damages. Whether to assess punitive damages lies within the discretion of the Court." *In re Grinspan*, 597 B.R. at 744.

Compensatory damages should be considered in light of what is necessary to repair the injury and reimburse the costs caused by the stay violation. Courts have found that this may include the reasonable attorneys' fees associated with the proceedings. As one court observed, "'[a] court may award attorneys' fees pursuant to section [362(k)] even if the debtor has suffered no other compensable harm.'" *In re Leiba,* 529 B.R. at 507 (quoting *In re Robinson,* 228 B.R. 75, 85 (Bankr. E.D.N.Y. 1998)).

Courts also recognize that emotional distress may give rise to actual damages for the purposes of establishing a claim under Section 362(k). But the standard of proof is high – as one court noted, an award of damages for mental anguish may be sustainable "only upon a showing of 'clear evidence to establish that significant harm occurred as a result of the violation.'" *Bace v. Babitt*, 2012 WL 2574750, at *3 (S.D.N.Y. July 3, 2012) (quoting *Dawson v. Washington Mut. Bank, F.A. (In re Dawson),* 390 F.3d 1139, 1148 (9th Cir. 2004)).

And in egregious situations, punitive damages may be appropriate. As the Second Circuit has held, "[a]n additional finding of maliciousness or bad faith on the part of the offending creditor warrants the further imposition of punitive damages." *In re Crysen/Montenay Energy Co.*, 902 F.2d at 1105. And as one bankruptcy court observed, "[p]unitive damages . . . are only appropriate where the stay violation was conducted in bad faith, with malice, or in a particularly egregious manner." *In re Ebadi*, 448 B.R. 308, 320 (Bankr. E.D.N.Y. 2011).

The party seeking to establish the stay violation bears the burden of proof. That is:

> To prevail on his claim, plaintiff has the burden of proof to present evidence in support of the allegations in his complaint that defendants willfully violated the automatic stay and to prove those allegations by a preponderance of the evidence . . . [This] . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence.

*In re Grinspan*, 597 B.R. at 733 (citations omitted). And "'as the finder of fact, the Court is

entitled to make credibility findings of the witnesses and testimony.'" *In re Grinspan*, 597 B.R. at 733 (quoting *Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 448 (S.D.N.Y. 2012), *aff'd*, 760 F.3d 247 (2d Cir. 2014)).

Finally, the Court notes that "'the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Ladd v. Menard*, 2016 WL 6810876, at *9 (D. Vt. Sept. 12, 2016), *report and recommendation adopted*, 2016 WL 6810755 (D. Vt. Nov. 17, 2016) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)) (quotation marks and citation omitted).

And in the context of a trial, courts should allow a *pro se* party "wide latitude in offering testimonial and documentary evidence and in the scope of his cross-examination of plaintiffs' witnesses, while holding him within ultimate technical bounds." *Hudnall v. Sellner*, 800 F.2d 377, 380 (4th Cir. 1986). *See Peikin v. Kenner*, 2008 WL 11411359, at *4 (C.D. Cal. Nov. 3, 2008) (observing that "federal courts must be liberal with pro se parties," and may decline to penalize a *pro se* litigant based "solely on [the party's] failure to conform to prevailing standards."). At the same time, a *pro se* party, like any party, ultimately must carry its burden as to each element of its claim for relief. *See, e.g.*, *Pierson v. Navient (In re Pierson)*, 2018 WL 4849658, at *4 (Bankr. N.D. Ohio Oct. 4, 2018) (stating that the *pro se* plaintiff "must prove each of the . . . elements" of his claim in order to prevail at trial).

## Discussion

The path to this evidentiary hearing, as noted above, began more than three years ago, in July 2016, with Yu Tang's purchase of the 80th Street Property from Irini Laskaratos and Yu Tang's agreement that, for a period of time, Irini Laskaratos could remain in her apartment with "full and exclusive use of and access to the backyard." Laskaratos Exh. 6 (Contract of Sale),

ECF No. 47.  That path continued through the May 2017 Eviction Action in New York state court, and eventually led to a series of bankruptcy cases filed by Irini Laskaratos, Mr. Laskaratos, and Kosta Laskaratos.

Mr. Laskaratos' application addresses a snapshot of the events and circumstances between the Laskaratos family and Yu Tang.  It calls for the Court to address a single question – did Yu Tang willfully violate the automatic stay and cause damages to Mr. Laskaratos in connection with the events of April 14?  To answer this question, the Court considers whether Mr. Laskaratos has met his burden to show each of the elements of a stay violation claim under Bankruptcy Code Section 362(k).

Specifically, the Court considers whether Mr. Laskaratos has carried his burden to show that he filed an individual bankruptcy petition, that Yu Tang had notice of his bankruptcy petition, that Yu Tang's actions amounted to a willful violation of the automatic stay, and that he suffered damages.  *See In re Leiba*, 529 B.R. at 506.  And he must establish each of these elements by a preponderance of the evidence.  *See In re Wright*, 328 B.R. at 663.

The Court considers each of these elements in turn.

### *Whether Mr. Laskaratos Has Shown that a Bankruptcy Petition Was Filed*

The first element that Mr. Laskaratos must establish to prove his stay violation claim is that "a bankruptcy petition was filed."  *In re Leiba*, 529 B.R. at 506.  This is because the automatic stay comes into effect upon the filing of a petition for relief.  *See* 11 U.S.C. § 362(a).

Here, the record shows that Mr. Laskaratos filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code on March 7, 2019.  And Yu Tang does not dispute that Mr. Laskaratos has filed for bankruptcy relief.

For these reasons, and based on the entire record, the Court finds that Mr. Laskaratos has established the first element of his stay violation claim, that a bankruptcy petition was filed.

*Whether Mr. Laskaratos Has Shown that the Debtor Is an Individual*

The second element that Mr. Laskaratos must establish to prove his stay violation claim is that his bankruptcy case is that of an "individual." *In re Leiba*, 529 B.R. at 506. This is because the plain terms of Section 362(k) state that "an *individual* injured by any willful violation of [the automatic stay] . . . shall recover actual damages." 11 U.S.C. § 362(a) (emphasis added).

Here, the record shows that Mr. Laskaratos filed his Chapter 13 petition, entitled "Voluntary Petition for Individuals Filing for Bankruptcy," in his individual capacity. Only an individual is eligible to be a debtor under Chapter 13. *See* 11 U.S.C. § 109(e). And Yu Tang does not dispute that Mr. Laskaratos is the debtor in this bankruptcy case in his individual capacity.

For these reasons, and based on the entire record, the Court finds that Mr. Laskaratos has established the second element of his stay violation claim, that the debtor is an individual.

*Whether Mr. Laskaratos Has Shown that Yu Tang Received Notice of His Bankruptcy Petition*

The third element that Mr. Laskaratos must establish to prove his stay violation claim is that Yu Tang "received notice of the petition." *In re Leiba*, 529 B.R. at 506. This element is satisfied if the creditor had "actual knowledge of the Debtor's bankruptcy filing." *In re Leiba*, 529 B.R. at 506-07.

Here, the record shows that Yu Tang had actual notice of Mr. Laskaratos' bankruptcy filing well in advance of the events of April 14. As one example, on April 1, 2019, approximately three weeks after the March 7, 2019 petition date, Yu Tang filed a Motion for

Stay Relief.  In its motion, Yu Tang states "on the eve of the vacate date [at the 80th Street Property], Tasso Laskaratos is filing for bankruptcy in order to receive an automatic stay."  Yu Tang Stay Relief Motion ¶ 4, ECF No. 17-1.  That is, Yu Tang's motion confirms both that Yu Tang was aware of Mr. Laskaratos's bankruptcy filing, and that it was aware of the automatic stay.  *See In re Leiba*, 529 B.R. at 506-07 (finding that "[the creditor] had actual knowledge of the Debtor's bankruptcy filing, which satisfies the notice required under § 362(k).").

For these reasons, and based on the entire record, the Court finds that Mr. Laskaratos has established the third element of his stay violation claim, that the creditor received notice of his bankruptcy petition.

*Whether Mr. Laskaratos Has Shown that Yu Tang's Actions Were in Willful Violation of the Automatic Stay*

The fourth element that Mr. Laskaratos must establish to prove his stay violation claim is that Yu Tang's actions "were in willful violation of the stay."  *In re Leiba*, 529 B.R. at 506.  And this, in turn, calls for the Court to determine whether the conduct in question violates the automatic stay; whether the conduct was willful; and whether the conduct comes within one of the recognized exceptions to the automatic stay, and accordingly, was not improper.

Whether Yu Tang's Actions Violated the Automatic Stay.  First, the Court considers whether Mr. Laskaratos has established that Yu Tang's actions at the 80th Street Property on April 14 amounted to a violation of the automatic stay.  The starting point for this analysis is the plain terms of Bankruptcy Code Section 362(a)(3).  That section provides that the automatic stay applies to "any act to obtain possession of property of the estate or of property from the estate or *to exercise control over* property of the estate."  11 U.S.C. § 362(a)(3) (emphasis added).

And these terms must be viewed against the scope of the automatic stay itself.  As one court noted, "[t]he scope of the stay is broad, encompassing almost any type of formal or

informal action taken against the debtor or the property of the bankruptcy estate.'" *In re TS Employment, Inc.*, 597 B.R. 494, 533 (Bankr. S.D.N.Y. 2019) (quoting *In re Salov*, 510 B.R. 720, 726 (Bankr. S.D.N.Y. 2014)).

Here, the record shows that Yu Tang's representatives arrived at the 80th Street Property on the morning of April 14, for the purpose of removing property owned by Mr. Laskaratos and his family members from the backyard of the premises. Yu Tang brought at least one worker to undertake this task, as well as a van, and the work was supervised by Ms. Tang and by Mr. Zhong Yu, the principal of the entity. The property that was removed included a table and chairs, a barbecue, several large potted plants, watering cans and gardening tools, and a large piece of plywood, among other items. This was acknowledged by Yu Tang's own witness, Ms. Tang, and confirmed by the detailed testimony of Mr. Laskaratos and Kosta Laskaratos.

This conclusion is also supported by the video evidence that was introduced by Mr. Laskaratos. The first video shows several of the items that were removed from the backyard of the 80th Street Property to the sidewalk. Laskaratos Exhibit 1 (video). Specifically, the video shows several large potted plants placed in close proximity to a white graffiti-marked van with an open back door. *Id.* It shows an individual identified as "one of the workers" entering the backyard of the 80th Street Property, exiting with a large potted plant, and placing it on the sidewalk. *Id.* It also shows that individual re-enter the backyard and toss a gardening tool across the backyard, and then move another large potted plant to the sidewalk. *Id.* Ms. Tang is also shown entering the backyard of the 80th Street Property. *Id.* And the video concludes as a police vehicle arrives. *Id.*

The second video shows a number of items, including several large plants, flowerpots, a table and chairs, a barbecue, and plywood placed in the backyard in a haphazard and disorderly

manner.  Laskaratos Exhibit 2 (video).  Mr. Laskaratos narrated the video, stating "they broke

everything, everything, misplaced everything" and that representatives of Yu Tang are "trying to

say we had it like this when we didn't."  *Id.*  Mr. Laskaratos specified that "[t]his [was] done

with their co-worker, and the landlord and the daughter, as in the previous video."  *Id.*  He

continued that "I obviously have some work ahead of me . . . as [previously] there was a clear

passageway on both ends" of the backyard, and now Yu Tang representatives "broke the doors

off over here, and they placed everything in the way like this so [that] the fire department can

come tomorrow.  Isn't that grand?  What a violation."  *Id.*  Mr. Laskaratos explained further,

continuing that "[f]rom the City of New York, there's an inspector supposed to come the 24th of

April.  Well look how they placed everything, all the chairs, everything.  Just to try to make a

case with the fire department that they lied to, and they didn't have."  *Id.*  Mr. Laskaratos also

described that "I had the worker [indecipherable] yelling at me, everyone calling me a jerkoff . . .

and the harassment reached up to this point."  *Id.*

   The record also shows that in response to the actions of Yu Tang and its representatives,

Mr. Laskaratos and his brother Kosta Laskaratos called the police, the police arrived and

promptly intervened between Yu Tang and its representatives on the one hand and Mr.

Laskaratos and his brother on the other, and ultimately, Yu Tang returned the property to the

backyard.  That is, the record shows that Yu Tang removed the property of Mr. Laskaratos and

his family from the backyard to the adjacent sidewalk and van – though in the end, only on a

temporary basis – and following the intervention and mediation by the police, the property was

returned in a haphazard and disorderly manner.

   Yu Tang argues that at the very most, what occurred on the morning of April 14 was "an

aborted attempt.  Whatever happened stopped.  It didn't go through.  It didn't become an actual

violation." Trial Tr. 206:22-24. And Yu Tang notes that "[t]he property basically just made a loop out onto the sidewalk and then back into the property. Whatever was there before was put back." Trial Tr. 206:19-21.

But Yu Tang's argument misses the mark. The question before the Court is not whether Mr. Laskaratos was permanently deprived of the property that Yu Tang removed – although that may well be a consideration in the context of damages. Rather, the inquiry at this stage is focused on the conduct of Yu Tang – whether Yu Tang undertook "any act to obtain possession of property of the estate or of property from the estate or *to exercise control over* property of the estate." 11 U.S.C. § 362(a)(3) (emphasis added). And the act need not be formal, or even successful. Rather, the "'scope of the stay is broad, encompassing almost any type of formal or informal action taken against the debtor or the property of the bankruptcy estate.'" *In re TS Employment, Inc.*, 597 B.R. at 533 (quoting *In re Salov*, 510 B.R. at 726). And actions that contravene the stay, even if they are later undone, may well trigger the consequences of a stay violation.

In considering a similar argument, one bankruptcy court considered whether an eviction conducted in violation of the automatic stay was later "rectified by returning all of the personal property that was removed . . . during the eviction" back to the estate. *In re Jean-Francois*, 532 B.R. at 456. The court rejected the creditor's argument that retuning the personal property somehow purged the creditor of the original violation. As the court observed, "even if [the creditor] returned the personal property to the Building after the eviction this does not alter the fact that [the creditor] evicted the Debtor in violation of the automatic stay." *Id.* Here too, Yu Tang's return of the property to the backyard "does not alter the fact" that the property was removed "in violation of the automatic stay." *Id.*

Accordingly, the Court finds that Yu Tang's actions violated the automatic stay.

<u>Whether Yu Tang's Conduct Was Willful</u>.  Even where a violation of the stay has been established, Section 362(k)(1) requires that the Court find the violation to be "willful" in order to justify an award of damages.  In this context, the term "willful" means "'any deliberate act taken by a creditor in violation of the automatic stay, which the violator knows to be in existence.'"  *In re Leiba*, 529 B.R. at 507 (quoting *In re Crysen/Montenay Energy Co.*, 902 F.2d at 1105).  To be sure, a conscious determination to commit a stay violation is not required.  As one bankruptcy court noted, a "'specific intent to violate the stay is not required; instead, general intent in taking actions which have the effect of violating the automatic stay is sufficient to warrant damages.'"  *In re Grinspan*, 597 B.R. at 744 (quoting *In re Jean-Francois*, 532 B.R. at 454).  Accordingly, the relevant inquiry is whether the creditor intended to take the action which violated the automatic stay – rather than whether the creditor intended to violate the stay.

Yu Tang argues that removing personal items from the backyard of the premises – even if the attempt were completed – would not rise to the level of a willful violation of the automatic stay because, in substance, Yu Tang was not aware that the automatic stay would prevent it from doing so:

> No one evicted them from their apartment.  [Yu Tang's representatives] believe that they were complying with an automatic stay when they didn't use the marshal to evict them from their apartment, that it extended to a backyard and blocking ingress and egress never came to anybody's mind.  There was no malice involved.

Trial Tr. 209:8-13.  To this same end, Ms. Tang testified that she was aware of the automatic stay, but had "little knowledge" about what it entailed.  Trial Tr. 167:1.  And she testified that "I have limit[ed] knowledge to the whole process of unlimited stay."  Trial Tr. 167:3-4.

But here again, Yu Tang's argument misses the mark.  The protection of the automatic stay would be hollow indeed if a creditor could avoid it by professing a limited knowledge of its

scope.  And similarly, the absence of malice does not suffice.  Courts agree that even a "'good faith belief in a right to the property'" is "not relevant" to the determination of whether the conduct at issue was willful.  *In re Grinspan*, 597 B.R. at 744 (quoting *In re Gilford*, 567 B.R. 412, 417 (Bankr. E.D.N.Y. 2017)).  Rather, the necessary inquiry is whether Yu Tang manifested a "'general intent in taking actions which have the effect of violating the automatic stay.'"  *In re Grinspan*, 597 B.R. at 744 (quoting *In re Jean-Francois*, 532 B.R. at 454).  In other words, did Yu Tang intend to take each step which, taken together, amounted to a violation of the automatic stay?

Here, the record shows that Yu Tang and its representatives planned and intended the events of April 14.  Yu Tang's representatives arrived at the 80th Street Property on the morning of April 14 in at least one vehicle and a van.  Yu Tang's representatives included Ms. Tang, as well as Mr. Zhong Yu and his sons and at least one worker to assist in removing the property.  The record also shows that Yu Tang's representatives removed the property from the 80th Street Property's backyard, and placed it in the van or on the sidewalk for removal.  And the record shows that Yu Tang's representatives moved it back into the backyard – but only after Mr. Laskaratos and his brother called the police, and the police intervened to "mediate" the situation between Yu Tang and Mr. Laskaratos and his brother.  The record also strongly suggests that but for that intervention by the police, Yu Tang would not have returned the property to the backyard of the 80th Street Property.  For example, the April 8 Notice states that "[i]f you don't remove your items by Saturday, April 13, 2019; we will send cleaning guys to clear the backyard."  Yu Tang Exhibit E (April 8 Notice).

Accordingly, the Court finds that Yu Tang's conduct was willful.

<u>Whether Yu Tang's Conduct Comes Within an Exception to the Automatic Stay</u>. The Bankruptcy Code recognizes that, in limited and specific circumstances, conduct that violates the automatic stay – even willful conduct – may be shielded from consequences because it comes within a statutory exception to the stay. These exceptions are specific, enumerated, and narrow, because they take away from the protection that the stay affords to a debtor – and to creditors – when a bankruptcy case is filed. Generally, these "exceptions are 'read narrowly to secure [a] broad grant of relief to the debtor.'" *In re Grinspan*, 597 B.R. at 734 (quoting *Stringer v. Huet (In re Stringer)*, 847 F.2d 549, 552 (9th Cir. 1988)). But these exceptions are also important, because they give effect to important policies that coexist with, and sometimes take priority over, the policies behind the automatic stay.

One exception to the automatic stay addresses actions by law enforcement and other authorities to protect the public's safety. As one noted commentator has observed, "the bankruptcy court is not a haven for wrongdoers." 3 *Collier on Bankruptcy* ¶ 362.05[5][a] (Alan N. Resnick and Henry J. Sommer eds. 16th ed. 2019), at 362-68. To this end, Bankruptcy Code Section 362(b)(4) provides an exception to the automatic stay for actions "by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power." 11 U.S.C. § 362(b)(4).

Courts have "narrowly construed [Section] 362(b)(4) to allow actions by governmental units to continue if they are enforcing laws affecting health, welfare and public safety." *In re Saint Vincent's Catholic Med. Centers of New York*, 429 B.R. 139, 148 (Bankr. S.D.N.Y. 2010). And courts recognize that this limitation extends only to actions "by a governmental unit," not by private actors asserting that they are acting in the interests of "health, welfare and public safety."

*Id*. That is, "[t]he plain and unambiguous language of 362(b)(4) only excepts actions brought by a governmental unit." *Id*.

Courts also wisely caution against extending the provisions of Section 362(b)(4) beyond the actions of governmental units, noting that such an expansive interpretation "would allow too many entities to have 'free rein over a debtor's assets simply because they state that they are enforcing police or regulatory power despite the fact that they generally lack any such authority.'" *In re Saint Vincent's,* 429 B.R. at 148 (quoting *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, 522 F. Supp. 2d 569, 577 (S.D.N.Y. 2007)).  As the Ninth Circuit observed, the opposite conclusion would require – at a minimum – an indication in the record that a government actor "'requested or directed'" the proponent "'to act in its stead.'" *Porter v. Nabors Drilling USA, L.P.*, 854 F.3d 1057, 1062 (9th Cir. 2017) (quoting *In re Edison Mission Energy*, 502 B.R. 830, 836 (N.D. Ill. 2013)).

Yu Tang does not specifically invoke any exceptions to the protection of the automatic stay.  At the same time, it argues that it took the actions that are the subject of this motion on April 14 in order to protect the safety of the other tenants and the premises at the 80th Street Property.  Yu Tang states:

> A stay, an automatic stay, cannot be so broad that it affects the rights of other people that live in a property and it cannot be so broad that it allows for the violation of state laws and safety codes.  It has to have some sort of reasonableness and if we cannot get the cooperation of this movant, the landlord tried to resolve the matter himself.

Trial Tr. 207:25-208:5.  And Ms. Tang testified generally about unspecified complaints to the Fire Department and Buildings Department, but was not able to provide specifics as to the date, source, or substance of those complaints.  For example, Ms. Tang testified that "only [in] 2019 someone called again the fire department and Building Department for complaint.  They came

40

out and asked us to do the same thing," – that is, clear out the backyard. Trial Tr. 197:25-198:2. When pressed, Ms. Tang stated "I don't know who called but there's complaints." Trial Tr. 198:6-7.

Here, the record does not show, or even suggest, that Yu Tang is a "governmental unit." Nor does the record show, or even suggest, that Yu Tang was acting at the behest of a regulatory entity. Yu Tang's exhibits show that on February 20, 2019, an individual who appears to be affiliated with a government entity stood in the lobby of the 80th Street Property, Yu Tang Exhibit C (surveillance footage); that on March 19, 2019, two individuals who appear to be affiliated with the Fire Department stood in the backyard of the premises, Yu Tang Exhibit B (surveillance footage); and that on March 29, 2019, there was a text message exchange between Ms. Tang and the superintendent stating that representatives of the Fire Department appeared at the premises and said the "yard has to be cleaned" and the "wood and chain has to come off the gate," Yu Tang Exhibit D (text messages). At most, the record contains conflicting evidence about whether the Buildings Department and Fire Department directed Yu Tang to address the situation at the 80th Street Property. And this is not sufficient to bring Yu Tang within the exception to the automatic stay established by Section 362(b)(4).

One additional exception to the automatic stay may be worthy of note. Bankruptcy Code Section 362(b)(22) provides that the automatic stay does not apply to "the continuation of any eviction, . . . or similar proceeding by a lessor against a debtor involving residential property in which the debtor resides as a tenant under a lease or rental agreement and with respect to which the lessor has obtained before the date of the filing of the bankruptcy." 11 U.S.C. § 362(b)(4). But the parties agree, and the record shows, that Yu Tang never entered into a lease with Mr. Laskaratos. As Mr. Laskaratos argues, "[t]he landlord never provided a lease." Trial Tr. 14:24-

25. And Yu Tang concurred, arguing that "[h]e doesn't have a lease.  He's not on the lease." Trial Tr. 8:8-9.  That is, Yu Tang does not come within the exception to the automatic stay established by Section 362(b)(22).

Accordingly, the Court finds that Yu Tang's actions do not come within an exception to the automatic stay.

*          *          *

For these reasons, and based on the entire record, the Court finds that Mr. Laskaratos has established the fourth element of his stay violation claim, that the creditor's actions were in willful violation of the automatic stay.

### *Whether Mr. Laskaratos Has Shown that He Suffered Damages*

The fifth element that Mr. Laskaratos must establish to prove his stay violation claim is that "the debtor suffered damages" as a result of the violation of the automatic stay.  *In re Leiba*, 529 B.R. at 506.  *See Bace*, 2012 WL 2574750, at *3 (stating that "the party seeking the damages award, 'has the burden of proving what damages were incurred and what relief is appropriate'" (quoting *In re Sucre*, 226 B.R. 340, 349 (Bankr. S.D.N.Y. 1998)).  The Court considers the question of damages as a result of Yu Tang's actions in the light of three possible components – first, damages from dislocated, missing, or damaged property; second, damages from emotional distress; and third, other consequential damages.

Damages from Dislocated, Missing, or Damaged Property.  The Court first considers whether Mr. Laskaratos has shown that he suffered damages from dislocated, missing, or damaged property as a result of Yu Tang's removal of items from the backyard of the 80th Street Property.

42

Here, the record shows that Mr. Laskaratos was temporarily deprived of the use of several items in the backyard of the 80th Street Property that he and his family owned and used on a regular basis – with Yu Tang's knowledge – including a table and chairs, a barbecue, and several large potted plants, among other items. That is, without the consent of Mr. Laskaratos or his family, and over their strenuous objection, Yu Tang's representatives removed property from the backyard and either loaded it into a van or placed it on the sidewalk for removal. This was shown by Mr. Laskaratos's testimony, and confirmed by the testimony of other witnesses, and it is also consistent with the video and photographic evidence that was introduced by both Mr. Laskaratos and Yu Tang. And this temporary dislocation plainly amounts to Yu Tang's "exercise [of] control" over that property. 11 U.S.C. § 362(a)(3).

The record also shows that after the police arrived and intervened, Yu Tang's representatives returned the items to the backyard of the premises, though they did so in a haphazard and disorderly manner. As Yu Tang argues, the items "basically just made a loop onto the sidewalk and then back into the property. Whatever was there before was put back. . . . Whatever happened stopped." Trial Tr. 206:19-23. This is consistent with a photograph of the backyard taken on May 1, 2019, showing the items removed from the premises on April 14 – including a table and chairs, barbecue, several large potted plants, and at least one watering can – returned in good condition to the premises. Yu Tang Exhibit J (surveillance photograph).

And the record shows that Mr. Laskaratos also acknowledged that, in substance, he could not identify any particular item of property that was missing. He testified that he was not certain whether property was missing from the 80th Street Property "from [April] 14th, the day of the incident, until today, [because] I haven't gone back to the backyard to take any inventory." Trial Tr. 70:7-9. And he testified:

Q.:  Secondly, nothing was ultimately taken, isn't that correct?

A.:  I'm sorry?  I already stated that I don't know for certain.

Trial Tr. 68:4-7.  He also did not identify any property that was damaged.  *See* Trial Tr. 63:19-20

("A.:  . . . there was nothing to be damaged but a lot of stuff was attempted to be stolen.").

That is, returning to the plain terms of Bankruptcy Code Section 362(a)(3), the record

establishes that Yu Tang temporarily "exercise[d] control" over property from the backyard of

the 80th Street Property.  It also shows that Mr. Laskaratos has suffered damages to the extent

that that property was dislocated, and also to the extent that it required both his active

intervention and the intervention of the police for that property to be returned.  At the same time,

the record shows that Mr. Laskaratos has not established that any of that property remains

missing or was damaged.

Accordingly, the Court concludes that Mr. Laskaratos has shown that he has suffered

damages from Yu Tang's stay violation as a consequence of dislocated, missing, or damaged

property.

Damages from Emotional Distress.  The Court next considers whether Mr. Laskaratos has

shown that he suffered damages from emotional distress as a result of Yu Tang's removal of

property from the backyard of the 80th Street Property.

Here, the record shows that the events of April 14 were profoundly disruptive and

disturbing to Mr. Laskaratos.  As he argues:

I was informed that I had an automatic stay.  I had properties in the backyard.

The landlord knew this.  The landlord was fine with this. . . . I filed for

bankruptcy . . . so I fell under hardships.  And I had a bankruptcy stay. . . . I

couldn't get an attorney.  But I knew I had the automatic stay.  So it was a

complete shock to me, it was a complete shock to me when the landlord stated a

Department of Buildings order to – I wasn't there or, you know, if I wasn't there

my property would have been taken while under an automatic stay.

Trial Tr. 34:13-24.

Mr. Laskaratos also testified to his distress and his response to the situation on that

morning, as Yu Tang's representatives began to remove items from the backyard:

A.: So I immediately called police officers to help and assist so they wouldn't

steal the property in the backyard.  And the police arrived.  And the police

mediated the situation and asked them to place the property back into the

backyard.

Trial Tr. 39:15-18.

And he testified that he was distressed as a consequence of his mother's response to the

situation:

A.:  I'm so upset, I am so upset because my mother came out into the backyard

that day, and considering her condition, her medical condition, . . . I had to, after

being cursed out all day, I had to go back inside and tell my mom don't worry

about it, it's okay, it's okay, you know, it'll be all right.

Trial Tr. 74:6-13.

Mr. Laskaratos further testified that later that day and into the evening, he and his brother

"had to put everything back in order," and "throughout this time the super was cursing at me.

. . . it was hurtful."  Trial Tr. 52:2-3, 52:11-12, 52:17.  And more than three weeks later, at the

evidentiary hearing on this application, Mr. Laskaratos testified that he was "still in shock," still

"upset," and "still in shock from the act itself."  Trial Tr. 74:3, 74:6-7, 74:14-15.

That is, the record shows that Mr. Laskaratos has established, by "'clear evidence'" of his emotional distress, that he experienced "'significant harm . . . as a result of [Yu Tang's stay] violation.'" *Bace*, 2012 WL 2574750, at *3 (quoting *In re Dawson*, 390 F.3d at 1148).

Accordingly, the Court concludes that Mr. Laskaratos has shown that he has suffered damages from Yu Tang's stay violation as a consequence of emotional distress.

Other Consequential Damages.  Finally, the Court considers whether Mr. Laskaratos has shown that he suffered other consequential damages as a result of Yu Tang's removal of items from the backyard of the 80th Street Property.

As the Bankruptcy Code recognizes, an individual injured by a willful stay violation may recover "costs and attorneys' fees." 11 U.S.C. § 362(k)(1).  But courts make a distinction between the costs of self-representation borne by an individual who cannot afford to retain counsel, including the value of his or her time, and "costs and attorneys' fees." *Id.*  As one bankruptcy court observed, "a *pro se* litigant is not entitled to attorneys' fees for self-representation." *Beckford v. Romano (In re Beckford)*, 2018 WL 3956590, at *4 (Bankr. D. Conn. Aug. 15, 2018).

In *Beckford*, the court reviewed the applicable law and the record in detail.  The court recognized that the debtor spent "numerous days . . . researching and preparing" matters for his case, but also noted that "none of the evidence submitted suggests that [he] missed days of work or incurred actual damages for this time." *In re Beckford*, 2018 WL 3956590, at *3 n.4.  Citing cases from several federal districts, the court found that an award of attorneys' fees was inappropriate to compensate a *pro se* debtor in an action under Section 362(k), because "'*[p]ro se* litigants cannot recover attorney's fees as an item of actual damages in an action under § 362(k).'" *In re Beckford*, 2018 WL 3956590, at *3 n.4 (quoting *Carter v. Barber (In re Carter)*,

2016 WL 1704719, at *6 (B.A.P. 9th Cir. Apr. 22, 2016)).  To the same effect, the court observed that "'statutory attorneys' fees [under Section 362(k)] cannot be awarded to pro se litigants . . . unless such a person is, in fact, an attorney.'"  *In re Beckford*, 2018 WL 3956590, at *3 n.4 (quoting *In re Dugas*, 2009 WL 3297958, at *11 n.62 (Bankr. E.D. Tex. Oct. 13, 2009)).

Here, the record shows that Mr. Laskaratos was required to spend significant time to address the consequences of Yu Tang's stay violation, including many hours on April 14 to replace the backyard items and restore the area to its original condition.  Mr. Laskaratos has also spent significant time pursuing this application, including several hearings and a day-long evidentiary hearing.  And the record shows that Mr. Laskaratos represented himself in all of these proceedings, because he could not afford to retain counsel.

Had Mr. Laskaratos retained and paid an attorney to represent him in this application, those fees could well be part of a damages award.  Similarly, while wages lost as a consequence of time spent to attend many hours of court hearings over several days could be an element of compensatory damages, that too has not been established here.  In addition, while a debtor's out-of-pocket expenses to restore a disheveled situation to good order, such as wages paid to workers, may be an element of compensatory damages, the law does not recognize a debtor's own efforts to do so as an element of a compensatory damages claim.

That is, here, as in *Beckford*, the record does not show, or even "suggest," that Mr. Laskaratos incurred costs and attorneys' fees, or that he "missed days of work or incurred actual damages for this time" as a result of Yu Tang's activities in violation of the automatic stay.  *In re Beckford*, 2018 WL 3956590, at *3 n.4.  And the case law confirms that the time spent and the burdens taken on by a self-represented litigant such as Mr. Laskaratos cannot, without more, be viewed as a compensable substitute for attorneys' fees and costs.

Accordingly, the Court concludes that Mr. Laskaratos has not shown that he suffered other consequential damages from Yu Tang's actions in violation of the automatic stay.

*         *         *

Having concluded that Mr. Laskaratos has shown that he has suffered damages as a consequence of the temporary dislocation of his property, as well as his emotional distress, the Court considers the question of an appropriate measure of damages.

As noted above, compensatory damages for a willful violation of the automatic stay should be considered in light of what is necessary to repair the injury and reimburse the costs caused by the stay violation. Some kinds of damage are easier to measure than others. For example, stolen or damaged property can be valued, lost wages can be calculated, and attorneys' fees and costs can be reimbursed. But there is no simple algorithm to calculate adequate and appropriate compensation for the temporary dislocation of personal property, or for emotional distress.

The Court first considers the compensatory damages appropriate to repair the injury to Mr. Laskaratos resulting from the temporary dislocation of property from the backyard of the 80th Street Property.

With hindsight, it is fair to say that no items were permanently removed, no damage to property was established, and Yu Tang's actions to "exercise control over [the] property" were ultimately unsuccessful. But it is also fair to say that a creditor may not commit a stay violation by removing a debtor's property and then erase that violation by returning the property at the direction of the police.

At the same time, the testimony of Mr. Laskaratos and his brother Kosta, as well as the video and photographic evidence, plainly establish that an injury occurred. Yu Tang's actions

were intrusive, disruptive, and burdensome, and considerable efforts were required to remedy them. And as noted, if the police had not intervened, the record strongly suggests that Yu Tang would have removed or discarded the property.

Based on the entire record, the Court concludes that an award of compensatory damages in the amount of $500 is adequate, appropriate, and necessary to compensate Mr. Laskaratos for the temporary dislocation of property from the backyard of the 80th Street Property.

The Court next considers the compensatory damages appropriate to address Mr. Laskaratos's emotional distress. Courts within and outside this Circuit recognize that this is a fact-intensive inquiry. As the Third Circuit observed, "[t]he evidence necessary to demonstrate such harm will likely vary from case to case." *Lansaw v. Zokaites (In re Lansaw)*, 853 F.3d 657, 670 (3d Cir. 2017). There, the court affirmed "a comparatively modest $7,500 award" in emotional distress damages, based on "evidence [that] shows that the stay violations were patently egregious, [and] a plaintiff's credible testimony that the violations did in fact cause emotional distress." *In re Lansaw*, 853 F.3d at 670.

Courts also acknowledge that this inquiry can be subjective. As Judge Higginbotham wrote, "there is 'no legal yardstick by which to measure accurately reasonable compensation' for injuries such as emotional distress." *Spence v. Board of Education of Christina School District*, 806 F.2d 1198, 1203 (3d Cir. 1986) (Higginbotham, J., concurring) (quoting *McDonald v. United States*, 555 F. Supp. 935, 971 (M.D. Pa. 1983)).

And courts may look to awards in other cases to serve as guideposts for a sound decision, both within and outside the context of a stay violation claim. As one bankruptcy court observed, it is possible to "obtain some guidance by looking to what other courts have awarded for

emotional distress damages in similar circumstances." *Lansaw v. Zokaites (In re Lansaw)*, 2015 WL 224093, at *10 (W.D. Pa. Jan. 14, 2015), *aff'd*, 853 F.3d 657 (3d Cir. 2017).

For example, one court found that the debtors were entitled to compensation for emotional distress where the bank violated the automatic stay by deducting funds from their checking account, causing one of the debtors to "experience[] a very public breakdown and [to] bec[o]me fearful that Debtors could ultimately lose their vehicle and their home." *In re Juliano*, 2012 WL 760312, at *1 (Bankr. N.D.N.Y. Mar. 2, 2012). The court noted that the bank's actions prevented the debtors "from obtaining groceries and certain prescription medications," and caused the debtors to be "placed on a bounced check list at their regular pharmacy" leading to "humiliat[ing]" scenarios and "great inconvenience." *Id.* The court determined that a damages award of $7,000 was warranted for the debtors' emotional distress, "based upon its observation of Debtors and consideration of their testimony that the distress each suffered was in addition to the general stress and anxiety normally attendant to the bankruptcy process." *In re Juliano*, 2012 WL 760312, at *2.

In addition, several courts have awarded significant sums to compensate a debtor for emotional distress when the debtor was deprived, even temporarily, of his or her home or personal possessions. For example, in *In re Johnson*, 601 B.R. 365 (Bankr. E.D. Pa. 2019), the bankruptcy court looked to amounts awarded in comparable cases, and concluded:

> In light of other comparable cases awarding emotional distress damages, the Court finds $15,000 to be a reasonable amount to compensate the Debtor for the obvious emotional harm the stay violations caused him. Even though the Debtor regained possession of the Property after a relatively short period, other factors, such as [the creditor's] aggressive conduct, the involvement of law enforcement, and the permanent loss of nearly all of his personal possessions and those of his housemate would necessarily cause a greater degree of emotional distress, warranting an award on the higher end of the acceptable range.

*In re Johnson*, 601 B.R. at 381 (footnote omitted).

And in *In re Trueman*, 2015 Bankr. LEXIS 4573 (Bankr. D. Nev. Feb. 12, 2015), the court awarded $25,000 in emotional distress damages where the debtor was evicted unexpectedly and without authorization by law enforcement officials, and the creditor retained her personal belongings for two weeks, causing the debtor to suffer anxiety, fear, anger, and hopelessness.  As the court observed, the "Debtor credibly explained that the manner in which she and her family were evicted from the [property] was deeply humiliating and caused substantial anxiety to herself and her family, manifesting in extreme anger towards her fiancé, a sense of hopelessness, and even suicidal thoughts." *In re Trueman*, 2015 Bankr. LEXIS 4573, at *24-25.  *See, e.g.*, *In re Dawson*, 346 B.R. at 511-12 (awarding $20,000 in emotional distress damages where creditor refused to rescind a foreclosure sale for five months and improperly filed an unlawful detainer, causing fear of homelessness); *Smith v. Homes Today, Inc. (In re Smith)*, 296 B.R. 46, 52-53, 55-56 (Bankr. M.D. Ala. 2003) (awarding $25,000 in emotional distress damages where as a result of repossession of debtor's mobile home, debtor became homeless, lost her job, had all her personal property lost or destroyed, suffered humiliation and depression, and had to seek psychiatric treatment).

Finally, in *In re Seaton*, 462 B.R. 582 (Bankr. E.D. Va. 2011), the court distinguished between emotional distress arising from the "cumulative stress" of a debtor's situation, and the particular emotional distress caused by the violation of the automatic stay.  *In re Seaton*, 462 B.R. at 603.  The court observed that "it is axiomatic that a debtor would experience emotional distress upon finding some of her personal belongings unexpectedly disposed of in a trash dumpster," but also cautioned that "it is appropriate to limit the award of damages for emotional distress to what flows proximately from the acts of removal and disposal and to award emotional distress damages." *Id.*

51

Here, the record shows that, as described above, the events of April 14 were profoundly disruptive and disturbing to Mr. Laskaratos.  He relied upon the protection of the automatic stay, and was distressed to learn that despite the stay, Yu Tang's representatives arrived to "steal the property in the backyard."  Trial Tr. 39:16.  He and his brother summoned the police – again, an indication of a heightened level of distress.  He was subject to verbal abuse from Yu Tang's representatives, including the building superintendent, during the day and into the evening, and had to reassure his mother not to worry about the situation, and that "it'll be all right."  Trial Tr. 74:12-13.

That is, like the debtor in *In re Juliano,* Mr. Laskaratos was subjected "humiliation" and "great inconvenience."  *In re Juliano,* 2012 WL 760312, at *2.  Like the situation in *In re Johnson,* the creditor behaved aggressively, law enforcement was involved, and the debtor's home and personal possessions were affected.  As in *In re Trueman,* Mr. Laskaratos has shown that Yu Tang's actions were "deeply humiliating."  *In re Trueman,* 2015 Bankr. LEXIS 4573, at *24.  And as in *In re Seaton,* while it is necessary to respect the difference between the "cumulative stress" of Mr. Laskaratos's situation and the particular emotional distress caused by Yu Tang's stay violation, it is also clear that here, it is possible to assess "what flows proximately from the acts" that violate the stay.  *In re Seaton,* 462 B.R. at 603.

For these reasons, and based on the entire record, the Court concludes that an award of compensatory damages in the amount of $1,000 is adequate, appropriate, and necessary to compensate Mr. Laskaratos for his emotional distress.

### *Whether Mr. Laskaratos Has Shown that He Is Entitled To Recover Punitive Damages*

Finally, the Court considers whether Mr. Laskaratos has shown that he is entitled to an award of punitive damages.  *See* 11 U.S.C. § 362(k).

"Bankruptcy courts have 'considerable discretion in granting or denying punitive damages.'" *Bace*, 2012 WL 2574750, at *3 (quoting *Stinson v. Cook Perkiss & Lew, APC (In re Stinson)*, 128 F. Appx. 30, 32 (9th Cir. 2005)). And generally, "'[p]unitive damages . . . are only appropriate where the stay violation was conducted in bad faith, with malice, or in a particularly egregious manner.'" *In re Grinspan*, 597 B.R. at 744 (quoting *In re Ebadi*, 448 B.R. at 320).

In addition, "'In New York, bankruptcy courts often assess awards of punitive damages that are reasonably proportionate to the actual damages.'" *Bace*, 2012 WL 2574750, at *3 (quoting *In re Westridge*, 2009 WL 3491164, at *4 (Bankr. S.D.N.Y. Oct. 23, 2009)). *See In re Lansaw*, 2015 WL 224093, at *13 (recognizing that "the imposition of punitive damages raises Constitutional due process concerns such that an award of punitive damages must bear some reasonable relationship to the amount of harm suffered by the plaintiff.").

Courts have identified several factors to be weighed in determining whether an award of punitive damages is appropriate. These are "the nature of the creditor's conduct, the creditor's ability to pay, the motives of the creditor, any provocation by the debtor, and the creditor's level of sophistication." *In re Jean-Francois,* 532 B.R. at 459 (citing cases).

Applying these factors, in *In re Jean-Francois*, Chief Judge Craig found that where a "creditor" learned of the debtor's bankruptcy filing "more than a week" before attempting to evict the debtor, used "physical violence" against the debtor's wife, acted with the "improper" motive to evict the debtor "despite his bankruptcy filing," and was "represented by counsel, and should understand the consequences of violating the automatic stay," an award of punitive damages in the amount of $50,000 was warranted. *In re Jean-Francois,* 532 B.R. at 459-60. The court observed that "'[p]arties may not make their own private determination of the scope of the automatic stay without consequence.'" *In re Jean-Francois*, 532 B.R. at 460 (quoting *In re*

*Diviney*, 211 B.R. 951, 969 (Bankr. N.D. Okla. 1997), *abrogated on other grounds by In re Johnson*, 501 F.3d 1163 (10th Cir. 2007)).

Applying substantially similar factors, in *In re Salov*, 510 B.R. 720 (Bankr. S.D.N.Y. 2014), Chief Judge Morris found that creditors violated the automatic stay when they obtained a writ of assistance to remove the debtor from her home following a pre-petition foreclosure sale. The court found that when the "Creditors moved to obtain a writ of assistance seeking to divest the Debtor of her possessory interest in the Property, that interest had already become property of the estate by the filing of the bankruptcy petition." *In re Salov*, 510 B.R. at 732. The court noted that "[i]t is clear that Creditors, through their counsel, were aware that an automatic stay was in effect." *In re Salov,* 510 B.R. at 733. And the court observed that "[f]rom the letter addressed to Debtor's counsel, it is clear that Creditors believed that they, and not the Court, had the authority to determine whether the automatic stay was in effect." *In re Salov*, 510 B.R. at 734-35. In "unilaterally conclud[ing]" that the automatic stay did not apply to the debtor's interest in the property, the creditors "ran the risk" of, among other things, liability for punitive damages. The court concluded that an award of punitive damages of $10,000 was warranted.

And in *In re Snowden*, 769 F.3d 651 (9th Cir. 2014), the Ninth Circuit affirmed an award of $12,000 in punitive damages when, "after a number of harassing phone calls" to the debtor at her job as a hospital nurse, a creditor "used an electronic funds transfer to debit Snowden's bank account for the amount due, overdrawing her account." *In re Snowden*, 769 F.3d at 654-55. The Ninth Circuit noted that the bankruptcy court found that the creditor exhibited "reckless and callous disregard for the law or the rights of others," with its "findings that [the creditor] failed to provide a policy or employee training about how to address debt collection following a bankruptcy filing." *In re Snowden*, 769 F.3d at 657-58. Accordingly, the court found that the

bankruptcy court did not abuse its discretion in awarding punitive damages to the debtor. *In re Snowden*, 769 F.3d at 657.

Here, as to the first factor, the nature of the creditor's conduct, the record shows that Yu Tang arrived at the 80th Street Property on a Sunday morning and began, in a disruptive fashion, to remove the possessions of Mr. Laskaratos and his family from the backyard. Yu Tang did so knowing that there was an automatic stay in place. Yu Tang argues that it relied on a very narrow view of the scope of the automatic stay – that somehow, the stay applied to an eviction by the marshal from an apartment, but did not apply to Yu Tang's own "eviction" of property from the backyard of the 80th Street Property. But here, as many other courts have found, "'[p]arties may not make their own private determination of the scope of the automatic stay without consequence.'" *In re Jean-Francois*, 532 B.R. at 460 (quoting *In re Diviney*, 211 B.R. at 969).

And while the record shows that Yu Tang returned the property to the backyard after a verbal altercation with Mr. Laskaratos and a mediation by the police, it also strongly suggests that if the police had not been summoned by Mr. Laskaratos and his brother, then the property would have been removed or discarded by Yu Tang. Accordingly, the Court finds that the nature of Yu Tang's conduct weighs in favor of an award of punitive damages.

As to the second factor, the creditor's ability to pay, Yu Tang is not a large financial organization – rather, it is a small real estate business. At the same time, it is plain from the record that it is capable of paying an appropriate award.

As to the third and fourth factors, the motives of the creditor and any provocation by the debtor, the record shows that Yu Tang and the Laskaratos family have had a difficult, strained, and contentious relationship, and that Yu Tang and its representatives have sought to evict Mr.

Laskaratos and his family from the 80th Street Property for an extended period of time, both formally through court proceedings and informally through actions such as those at issue here. The record also shows that the Laskaratos family has resisted those efforts, including by filing at least three bankruptcy cases in this Court. Accordingly, the Court finds that the motives of the creditor – to evict the Laskaratos family by both formal and informal means – weigh to some extent in favor of an award of punitive damages. But the Court also finds that this is counterbalanced to some extent by the efforts of Mr. Laskaratos and the Laskaratos family to block those efforts, including by the filing of multiple bankruptcy cases.

As to the fifth factor, the creditor's level of sophistication, the record shows that like the creditor in *In re Jean-Francois,* Yu Tang "is a real estate investment entity, represented by counsel, and should understand the consequences of violating the automatic stay." *In re Jean-Francois,* 532 B.R. at 460. Here, as there, this too weighs in favor of an award of punitive damages.

As described above, the Court has already concluded that a total award of compensatory damages in the amount of $1,500 is adequate, appropriate, and necessary to compensate Mr. Laskaratos for the temporary dislocation of property from the backyard of the 80th Street Property and for his emotional distress. Courts concur that awards of punitive damages may wisely be assessed in reasonable proportion to the actual or compensatory damages that are shown. Based on the entire record, the Court concludes that an equivalent amount, or $1,500, is an adequate, appropriate, and necessary award of punitive damages in these circumstances.

## Conclusion

For the reasons stated above, and based on the entire record, the Court finds that Mr. Laskaratos has established his claim for a violation of the automatic stay under Bankruptcy Code

56

Section 362(k).  He has shown that he is entitled to an award of compensatory damages in the amount of $1,500, and an award of punitive damages in the amount of $1,500, for a total award of $3,000.

An order in accordance with this Memorandum Decision will be entered simultaneously herewith.



**Dated: Brooklyn, New York**
**August 30, 2019**

_____
**Elizabeth S. Stong**
**United States Bankruptcy Judge**